ESTATE of Harry S. BOND
v.
The UNITED STATES.
No. 205-57.

United States Court of Claims.
Jan. 24, 1964.

Martin Rubashkin, for plaintiff. Philip Zimet, New York City, John J. Slain, and Alfred L. Scanlan, Washington, D. C., were on the brief.

Gilbert W. Rubloff, Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for

defendant. Edward S. Smith, Lyle M. Turner, and Philip R. Miller, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

JONES, Chief Judge.

This is a suit by the executor of the estate of Harry S. Bond for a refund of income taxes which plaintiff alleges were erroneously collected for the year 1951. Plaintiff asserts that there was an overpayment of income taxes due to his failure to deduct from taxable income for 1951 that portion of the income which became payable to the legatees and distributees during that year.

The issue involved section 162(b) and (c) of the Internal Revenue Code of 1939, as amended by section 111 of the Revenue Act of 1942 (26 U.S.C. § 162 (1952 ed.)) and Treasury Regulations issued pursuant thereto, pertinent parts of which are found in the footnote.[1]

---

1. 26 U.S.C. § 162 (1952 ed.):
  "§ 162. Net income
  "The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that—
  * * * * *
  "(b) [as amended by § 111(b) of the Revenue Act of 1942, c. 619, 56 Stat. 798] There shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to the legatees, heirs, or beneficiaries, but the amount so allowed as a deduction shall be included in computing the net income of the legatees, heirs, or beneficiaries whether distributed to them or not. As used in this subsection, 'income which is to be distributed currently' includes income for the taxable year of the estate or trust which, within the taxable year, becomes payable to the legatee, heir, or beneficiary. * * *
  "(c) [as amended by § 111(c) of the Revenue Act of 1942, supra] In the case of income received by estates of deceased persons during the period of administration or settlement of the estate, and in the case of income which, in the discretion of the fiduciary, may be either

distributed to the beneficiary or accumulated, there shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year, which is properly paid or credited during such year to any legatee, heir, or beneficiary, but the amount so allowed as a deduction shall be included in computing the net income of the legatee, heir, or beneficiary;"
  * * * * *
  Treasury Regulations 111 (1939 Code):
  "Sec. 29.162–2. ALLOCATION OF ESTATE AND TRUST INCOME TO LEGATEES AND BENEFICIARIES.—
  * * * * *
  "(b) Allocation among income beneficiaries and legatees.—
  * * * * *
  "As used in section 162, the term 'income which becomes payable' means income to which the legatee, heir, or beneficiary has a present right, whether or not such income is actually paid. Such right may be derived from the directions in the trust instrument or will to make distributions of income at a certain date, or from the exercise of the fiduciary's discretion to distribute income, or from a recognized present right under the local law to obtain income or compel a distribution of income. Income is not con-

## The Facts

The facts are set out in the findings of fact. Briefly, they are as follows:

Harry S. Bond (decedent) died December 24, 1935. His will was admitted to probate in Connecticut, December 31, 1935. It provided three classes of bequests: 1. Specific: Certain personal effects were bequeathed. These are set out in the fourth and tenth paragraphs of the will. 2. General: Legacies in definite amounts aggregating $248,500 were directed to be paid to designated persons. These are set out in finding 4. 3. Residuary: The remainder of the assets of the estate, after payment of expenses, debts, and the above bequests were satisfied, was left to certain relatives. (Finding 5.)

The bulk of the estate consisted of stock in the Hotel Bond Company (hereafter referred to as the "Corporation") valued for tax purposes at $343,859.70. However, at the time of his death the decedent owed the Corporation the sum of $239,755.50.

The will contemplated that the decedent's assets including the stock in the Corporation, were to be sold and the proceeds distributed according to the terms of the will within 2 years. Yet the executors (originally five in number, of which number one died, one later resigned, and one was removed) operated the Hotel Bond Company properties approximately 17 years until June 1, 1951, at which time they sold decedent's stock in the Corporation to the Gateway Company for $779,745.60. Out of the proceeds of the sale the sum of $239,745.60 was turned over to the Corporation in

payment of the estate's debt to the Hotel Bond Company. The sales price exceeded the estate tax valuation by $435,885.90, thus resulting in gross income of that amount.

In late June or early July 1951, the executors filed with the Probate Court of the District of Hartford, Connecticut, an administration account which contained a schedule of proposed distribution of the estate's assets. This schedule provided for the payment of principal aggregating $248,500 to the cash legatees. The schedule also provided, pursuant to the terms of Connecticut law, for the payment of interest on these cash legacies, except those listed in the sixth and seventh paragraphs of the will, at the rate of 6 percent per annum from December 24, 1936 to July 17, 1951, in the sum of $173,453.01.

The hearing, after two postponements, was finally set for December 27, 1951. On the latter date the Probate Court entered an order finding the accounts filed by the executors true—with certain minor exceptions not germane here—and finding "that all legacies which have not lapsed have been paid" and "that all claims duly presented within the time limited by this Court have been paid, settled or barred by law." The court then ordered the rest, remainder and residue of the estate to be paid over to the residuary distributee according to the terms of the will. The actual payment of these legacies was not made until October 30, 1952.

There were seven separate appeals from the Probate Court's order of December 27, 1951.[2] Two of these appeals

sidered to become payable within a taxable year where during the entire taxable year there is only a future right to such income. For example, under valid terms of a trust instrument income received by a trust during a taxable year is to be accumulated under the twenty-first birthday of the beneficiary (or his prior death), at which time the accumulated income is to be distributed to the beneficiary (or his estate, as the case may be). In such case, the income of the trust received in any taxable year prior

to the taxable year of the trust in which the date of distribution occurs (the beneficiary's twenty-first birthday or his prior death) is not income which becomes payable within such prior taxable year but is income which becomes payable in the taxable year of the trust in which the date of distribution occurs. In any case, income becomes payable at a date not later than the date it is actually paid for the use of the distributee."

2. Since there were 41 general legatees for definite amounts, some of whom were

complained, *inter alia*, of the alleged invalidity of the sale of the stock of the corporation by the executors and prayed that the sale be set aside. These appeals were nonsuited September 26, 1952. The five other appeals claimed that the plaintiffs therein were aggrieved by the approval, acceptance, and allowance of the administration accounts, by alleged mismanagement on the part of the executors, and the improper allocation of payments between the legatees in the schedules filed and approved in the order of December 27, 1951. Numerous representations were made by the five different appellants as grounds for setting aside or modifying the probate order of December 27, 1951. These included, *inter alia,* that the court erred in improperly allowing certain accounts of the executors, in not properly allocating the amounts to be distributed, in accepting the proposed schedules, in not allowing interest on certain legacies, and on the method of scheduled distribution.

According to a stipulation for judgment signed by the legatees October 27, 1952, an order was entered by the Superior Court on November 7, 1952, in these five appeals, providing that interest be paid on the legacies set out in the sixth and seventh paragraphs of the will at the rate of 5 percent per annum from December 24, 1936, to the date of distribution, October 30, 1952. There had been allowed no interest to these several legatees according to the schedules originally filed. Since the several disputants had at last agreed on a distribution, which the court approved for payment as of October 30, 1952, we have not undertaken to list the changes, if any of consequence, in the first and last schedules of payment.

## The Issue

■ The ultimate issue is whether by the terms of section 162(b) and (c) (as amended by section 111(b) and (c) of the Revenue Act of 1942, supra) and the Treasury Regulations issued pursuant thereto, the bequests named in the will became payable or were properly to be paid or credited to the legatees, heirs, or beneficiaries during the year 1951, or whether a present legal right to compel distribution arose during that year.[3]

We think in the circumstances of this case the income for 1951 was neither paid, payable, nor properly to be credited to any of the legatees during that year, nor could such legatees have enforced distribution during 1951.

The Probate Court order of December 27, 1951, was materially changed in the latter part of the year 1952. This change involved not only a correction of error made as a result of the fact that the probate judge had been led to believe that all of the legacies which had not lapsed had been paid, but also a correction of the failure to allow interest on the legacies set out in the sixth and seventh paragraphs of the will. This interest had not been included in the list of scheduled payments submitted to the court for action in the probate order of December 27, 1951.

The correction of this error changed the prorated amount available for distribution to the other legatees by the final order of distribution as of October 30, 1952. The Probate Court order of December 27, 1951, did not direct the distribution of any of the general legacies. It did direct that payment of any residue of the estate be made to the residuary distributees. However, there was no

---

also residuary legatees, it is not surprising that a dispute should arise and appeals should be taken. In fact, one of the appellants, a brother of the deceased, was one of the general legatees and, along with other relatives, a residuary legatee.

3. Both the House and Senate Committee Reports on H.R. 7378, which became the 1942 Act, indicate that Amendment 111,

which affected section 162 of that Act, was approved because under the construction of existing law some beneficiaries were avoiding the tax or shifting the burden to other beneficiaries. The amendment, 162(b) and (c), makes it crystal clear that the tax must be paid either by the estate or it is brought within the scope of section 162, as amended, by the beneficiary.

such remainder or residue. This part of the order no doubt was the result of the impression the court had that all unlapsed legacies had been paid. There were not enough funds in the estate to pay the amounts specified in the definite legacies and statutory interest thereon and these amounts of interest had to be prorated. There was no remainder in the estate. In addition, the order of December 27, 1951, reserved no amounts for the payment of the estate's income taxes. These income taxes were reported and paid in early 1952, in the sum of $108,971.48.

Thus, clearly the funds were not only not distributed or credited to the legatees in 1951, they were not ready for such action. In fact, neither the proposed schedule of distribution nor the court's erroneous recital and approval of a distribution supposedly already made included any mention of or reservation for payment of income taxes. The schedule submitted by the executors in 1951 had proposed interest payments to certain of the legatees, pursuant to the Connecticut law, in the aggregate sum of $173,453.01. But when the several disputants entered into a stipulated agreement in late 1952 it had been found that the payment of income taxes and other expenses had left only $76,758.60 for payment of interest on the legacies. So this amount was prorated among the named legatees, thus permitting payment of less than half the interest due.

The stipulation for judgment, signed on October 27, 1952, finally provided for actual payment to the legatees and fixed the distribution date as October 30, 1952. The Superior Court entered an order approving the 5 percent interest payment on the legacies named in the sixth and seventh paragraphs of the will which had been denied interest according to the original schedules filed by the executors. The court approved the schedule of distribution agreed upon by the interested parties and decreed the ending of interest on all the legacies as of October 30, 1952, the date of distribution. The actual payment to the designated legatees was made on October 30, 1952. The executors filed a supplemental report with the Probate Court in January 1953 showing the distribution that was made on October 30, 1952. This was approved in June 1953 by the Probate Court for the District of Hartford.

■ Whether section 162(b) or section 162(c) is applicable, the Probate Court decree of December 27, 1951, did not made any income assignable to the beneficiaries, within the statute, in the year 1951. From what we are told of Connecticut law, that decree did not finally order any distribution or allocation to the specific legatees, and those beneficiaries had no right at that time to enforce payment. The curiously worded decree did not explicitly direct distribution to the specific legatees; an appeal was taken; significant modifications were made in a later year; and the ultimate distribution differed materially from what appeared likely in 1951. The 1951 decree should therefore not be deemed a true final closing of the estate or an enforceable order of distribution. Accordingly, in 1951, there was no income "to be distributed currently by the fiduciary to the legatees, heirs, or beneficiaries" (under section 162(b)) or income "which is properly paid or credited during such year to any legatee, heir, or beneficiary" (under section 162(c)). See Treas.Reg. 111, Section 29.162–2(b); Commissioner v. Stearns, 65 F.2d 371 (C.A.2d 1933), cert. denied, Stearns v. Burnet, 290 U.S. 670, 54 S.Ct. 90, 78 L.Ed. 579 (1933). This ground of decision suffices to dispose of both aspects of taxpayer's claim—that based on the principal amount of the legacies and the alternative argument as to the interest. For the legacies themselves, there is the additional ground that, after as well as before the 1942 amendment, these lump sum payments constituted principal, not income, to the specific legatees. Old Colony Trust Co. v. Commissioner, 38 B.T.A. 828 (1938); Dunlop v. Commissioner, 165 F.2d 284 (C.A. 8th 1948). Cf. Carlisle v. Commissioner, 165 F.2d 645 (C.A. 6th 1948) (residuary distributee). With respect

to the interest, we see no need in this case to pass upon the correctness or the reach of Davidson v. United States, 149 F.Supp. 208, 137 Ct.Cl. 416 (1957).

We have examined the numerous cases cited by both plaintiff and defendant in their briefs.[4] We will not undertake to review all of them. There are some conflicts and overlapping. A number of the cases cited by plaintiff deal with the question of whether interest which had been paid on legacies was to be included in the legatees' gross income. Some of the cases cited by plaintiff clearly state that an order entered by the Probate Court decreeing distribution is final unless appeal is taken therefrom. Some of them indicate that it is final in the peculiar circumstances of the particular case even though there is an appeal therefrom. There is thus some conflict in those decisions.

In spite of the seeming conflicts, out of all these decisions emerges the simple conclusion that the estate must pay the tax in the year of the receipt of its income, with the single exception that the estate brings itself within the terms of section 162(b) or (c). Under these provisions of the statute it is made quite clear that the tax is to be paid either by the estate or the legatees during the current year.

We hold that the record in this case taken as a whole shows that the legacies were not paid, payable, or credited to the legatees during the year 1951, and that the legatees had no present right to compel distribution during that year; that all the legacies were paid on October 30, 1952; that they were paid by the executors out of the estate's income for the year 1951; that the estate's income tax paid by the executors for the year 1951 is the only tax shown to have been paid on that income, and that the exceptions set out in section 162 (b) and (c) do not apply in the facts and circumstances of record in this case.

The petition is dismissed.

---

4. Taxpayer also relies upon Polt v. Commissioner, 233 F.2d 893 (C.A.2d 1956); DeBrabant v. Commissioner, 90 F.2d 433 (C.A.2d 1937); Carlisle v. Commissioner, 165 F.2d 645 (C.A.6th 1948); Dunlop v. Commissioner, 165 F.2d 284 (C.A.8th 1948); United States v. Arnold, 89 F.2d 246 (C.A.3d 1937) (which involved a small sum which did not belong to the estate); Potwine's Appeal, 31 Conn. 381 (1863). Taxpayer cites numerous other cases and comments on a number of them in plaintiff's brief.

The defendant cites United States v. Folckemer, 307 F.2d 171 (C.A.5th 1962); Wolf v. Commissioner, 84 F.2d 390 (C.A. 3d 1936); Freuler v. Helvering, 291 U.S. 35, 54 S.Ct. 308, 78 L.Ed. 634 (1934). There are a number of other cases, some of which are commented on in the brief. Both parties fairly discuss the meaning and interpretation of some of the cases which are cited in both briefs.